# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| MALIKAH LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Case No. 3:11-cv-0837** |
| | ) | **Judge Trauger** |
| v. | ) | |
| | ) | |
| MEDASSETS NET REVENUE SYSTEMS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Pending before the court is the Defendant/Counter-Plaintiff's Motion for Summary Judgment (Docket No. 17), to which the plaintiff has responded (Docket No. 20). For the reasons discussed herein, the defendant's motion will be granted in part and denied in part.

## FACTUAL BACKGROUND

The plaintiff, an African-American female, was formerly employed by the defendant, MedAssets Net Revenue Systems, LLC ("MedAssets"), for a period of two years from June 29, 2009 to June 28, 2011.[1] MedAssets and its affiliates assist hospitals and health care systems achieve greater financial strength by improving their operating margins and cash flow. The company helps its clients achieve these goals by, among other things, providing revenue cycle

---

[1] Unless otherwise noted, the facts are drawn from the defendant's statement of undisputed facts (Docket No. 18), the plaintiff's responses thereto (Docket No. 21), and related exhibits. The court draws all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Brown v. United States*, 583 F.3d 916, 919 (6th Cir. 2009).

management and supply chain management services and programs. It maintains locations throughout the United States, including offices in Nashville, Tennessee and Franklin, Tennessee.

When she joined MedAssets, the plaintiff worked as a Senior Consultant of Professional Services in the company's Revenue Cycle Services business unit. The plaintiff worked in this capacity for a period of approximately eighteen months. As a Senior Consultant, the plaintiff worked from her home in Illinois, although she spent a substantial portion of time traveling to projects located in Louisiana and New Jersey. Her project supervisor in Louisiana was Albert De La Cruz, MedAssets' Vice-President of Accounts Receivable Services. While working in New Jersey, the plaintiff was supervised by Gretchen Ryan, MedAssets' Vice President of Professional Services. As a Senior Consultant, the plaintiff initially earned a salary of $90,000 per year. Her annual salary later increased to $92,000.

Throughout the course of her employment at MedAssets, the plaintiff expressed her keen interest in advancing to more senior-level positions to her supervisors. In this context, the company maintained a Transfers and Promotions Policy which provided in pertinent part:

> To be eligible to apply for a transfer or promotion you must:
> • Meet the qualifications of the job.
> • Have been in your present position for at least one year.
> • Have received an overall acceptable rating on your last performance review.
> • Are not currently on a Performance Improvement Plan.

The plaintiff was aware of and had previously reviewed this policy.

Toward the latter part of 2010, the plaintiff began to search for other opportunities within the company. Having been in her current Senior Consultant position for at least one year, the plaintiff decided to apply for an Executive Director vacancy in Nashville, Tennessee. The plaintiff sought out this vacancy because she had family in the area, liked Nashville, and knew

that the position would require less travel.  The plaintiff interviewed for the Executive Director

position in 2010, but was not selected.

 At the time she interviewed, the plaintiff was working on a New Jersey-based project.

Her supervisor at the time, Ms. Ryan, informed the plaintiff that she was not selected for the

Nashville vacancy because she was not ready for the position at that time and that, in any event,

the New Jersey project could not afford to lose her.  While the plaintiff did not share Ms. Ryan's

belief that she was not ready to be an Executive Director, she did agree that her departure from

the project in New Jersey would jeopardize its success.

 After learning that she was not selected for the Executive Director position in Nashville,

the plaintiff planned to leave the company and submitted her resignation letter to Ms. Ryan.  Ms.

Ryan, however, refused to accept the plaintiff's resignation.  Instead, she informed the plaintiff

that there was a Manager of Accounts Receivable Services position being created in Nashville

and that she would refer the plaintiff for that position.  Indeed, the day after this discussion, the

plaintiff traveled to Nashville to interview for the Manager position and was ultimately selected.

MedAssets never posted the Manager position and the plaintiff was the only candidate that was

interviewed.

 The official offer was subsequently mailed in a letter dated November 10, 2010.

Among other things, the offer letter explained that MedAssets would provide the plaintiff with a

one-time relocation bonus of $10,000.  However, the letter added that "[i]f you voluntarily leave

the Company's employment within one year of your start date[,] you agree to reimburse the

Company the costs of relocating your family in full."  The plaintiff signed the offer letter and

accepted the $10,000 relocation bonus.  Although the Manager position paid the plaintiff a lower

salary, it was still a promotion from her prior Senior Consultant post. She relocated to Nashville in November 2010 and officially began working in her new role on December 6, 2010.

In March 2011, MedAssets posted a job announcement seeking a Director of Self-Pay for its Nashville office. Although the Nashville office did not have a self-pay line of business at the time, the company was planning to add it as the office grew. The Director of Self-Pay position was publicly posted for approximately six weeks, from March 24, 2011 through May 9, 2011.

MedAssets subsequently hired Brandon Webb, a white male for the Director position. However, when hired, Mr. Webb did not join the Nashville office as the Director of Self-Pay but, instead, assumed a more expanded role as the Director of Accounts Receivable Services. This change in responsibility resulted from a recent reduction of force at the Nashville location. While Mr. Webb was still technically responsible for self-pay business, the record evidence shows that this line of business remains nonexistent at the Nashville location. As a result of his expanded job responsibilities, Mr. Webb became the plaintiff's direct supervisor.

According to MedAssets, the plaintiff never applied for the Director of Self-Pay opening, despite her awareness that the position was posted. The plaintiff's then supervisor, Mr. De La Cruz, who at the time was running the Nashville office on an interim basis, testified that the only reason the plaintiff was not considered for the open position was because she failed to satisfy the one-year in-job requirement contained in the Transfers and Promotions Policy. The plaintiff maintains that she did, in fact, apply for the Director of Self-Pay position, as she informed Mr. De La Cruz of her interest in the self-pay and other Director-level positions. She also testified that MedAssets inconsistently applied the aforementioned one-year in-job requirement. She specifically cited the example of Anna Fuller, an African-American female who received a

promotion to a Supervisor-level position, notwithstanding the fact that she had failed to satisfy the one-year in-job requirement.[2]

Sometime following Mr. Webb's hire, MedAssets presented a new proposed non-compete agreement to the plaintiff. This was done as part of the company's efforts to ensure that all employees in Manager-level positions and above would be subject to a single standardized non-compete agreement. At the time that MedAssets undertook these efforts, the plaintiff was already subject to a preexisting non-compete agreement with the company that was effective on June 29, 2009. That agreement was indefinite in its duration and specifically provided that it "may be amended . . . with (and only with) the written consent of each of the parties hereto." After being presented with the new proposed non-compete agreement, the plaintiff refused to sign it. The plaintiff was informed that the consequences of not signing the new agreement was that she would be terminated. The plaintiff refused to sign the agreement, and MedAssets terminated her employment on June 28, 2011. According to MedAssets, the plaintiff voluntarily terminated her employment by choosing not to sign the new non-compete agreement. MedAssets asserts that, because the plaintiff voluntarily left her employment within one year of her start date in Nashville, she was obligated to repay the $10,000 relocation bonus she previously received.

The plaintiff denies that she voluntarily left MedAssets, but instead asserts that she was simply exercising her rights under the June 29, 2009 non-compete agreement to withhold her consent to signing a new modified contract. She also claims that Greta Clere, a white female Manager, was not required to repay her relocation bonus, despite the fact that she voluntarily

---

[2] Ms. Fuller reported directly to the plaintiff at all relevant times.

resigned from her employment with MedAssets within one year of her start date.[3]  (Docket No. 20, Ex. 1, at 3.)

During the course of her employment, the plaintiff possessed a corporate credit card that she used for various business expenses.  Generally, the plaintiff would receive reimbursements from MedAssets for the expenses charged, and the plaintiff assumed responsibility for paying the corresponding credit card balances.  At or shortly following her termination, the plaintiff received a reimbursement from MedAssets for expenses that were charged on the corporate credit card.  However, on this occasion, the plaintiff failed to submit a payment for the corresponding balance.  The plaintiff concedes that she owes approximately $2,500 to $2,800 for these credit card charges.  According to MedAssets, the total amount owed is $2,907.44, which the company itself paid.

The plaintiff commenced this action on September 1, 2011 alleging federal and state law claims for discrimination.  (Docket No. 1, at 1, 3-4.)  Specifically, she alleges that MedAssets failed to promote her to a Director-level position on the basis of her race and sex.  (*Id.* at 3.)  The plaintiff also contends that the company discriminated against her on the basis of her race when it required her to repay the relocation bonus, but did not similarly require Ms. Clere to make such a repayment.  (*Id.* at 4.)  The plaintiff has asserted claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq* (2011).  (*Id.* at 1.)

---

[3] Ms. Clere was subject to a Performance Improvement Plan giving her a specific amount of time to improve or be terminated.  However, before being terminated, Ms. Clere offered to voluntarily resign if MedAssets would agree to waive the requirement that she repay her relocation bonus.  MedAssets accepted this offer.  At the time of her termination, the plaintiff had no performance deficiencies.  Her supervisor, Mr. De La Cruz, testified that her job performance had in fact been "very good" and that he was sad to see the plaintiff leave the company.

On November 3, 2011, MedAssets filed its Answer and Counterclaim.  (Docket No. 10.)
In its counterclaim, MedAssets alleges that the plaintiff agreed to enter an enforceable contract
with the company when she signed the November 10, 2010 offer letter accepting its terms.  (*Id.* at
6, 8.)  Pursuant to that contract, the plaintiff agreed to accept a $10,000 relocation bonus subject
to the requirement that she repay the bonus if she voluntarily left the company within one year of
her start date.  (*Id.* at 5-6.)  According to MedAssets, the plaintiff voluntarily terminated her
employment within one year of her start date by refusing to sign the new non-compete
agreement, but has nonetheless failed to repay her relocation bonus.  (*Id.* at 8.)  Thus, MedAssets
contends that the plaintiff has breached the terms of the November 10, 2010 offer letter.  (*Id.*)  It
also alleges that the plaintiff has been unjustly enriched by receiving a reimbursement from the
company for expenses charged on her corporate credit card while failing to pay the corresponding
balance for those charges.  (*Id.* at 8-9.)  MedAssets filed the present motion on May 31, 2012.
(Docket No. 17.)

## ANALYSIS

### I.        Standard of Review

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows
that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a
matter of law."  Fed. R. Civ. P. 56(a).  If a moving defendant shows that there is no genuine issue
of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the
plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that
there is a genuine issue for trial."  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir.
2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "In evaluating the

evidence, the court must draw all inferences in the light most favorable to the non-moving party."
*Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## II.    The Defendant's Motion

MedAssets contends that it is entitled to summary judgment on all of the claims asserted in the plaintiff's Complaint. (Docket No. 17, at 1.) Specifically, it contends that the plaintiff's race and sex discrimination claims and her demand for punitive damages should be dismissed. (*Id.* at 1-2.) In addition, MedAssets seeks summary judgment as to its own counterclaims for breach of contract and unjust enrichment. (*Id.* at 2.)

### A.    Failure to Promote

The plaintiff claims that MedAssets failed to promote her to the Director position in the Nashville office in favor of Mr. Webb on the basis of her race and sex. (Docket No. 1 ¶¶ 7, 9.) MedAssets contends that the plaintiff's failure to promote claim must be dismissed because she cannot establish a prima facie case of discrimination. (Docket No. 17, at 1.)

When faced with a motion for summary judgment, "a plaintiff must adduce either direct or circumstantial evidence to prevail on a Title VII" discrimination claim. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009) Since the plaintiff has failed to adduce any evidence of direct discrimination on the basis of race or sex, the court will employ the *McDonnell Douglas/Burdine* burden-shifting framework.[4] *See McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *Upshaw*, 576 F.3d at 584. Initially, the plaintiff must first establish a prima facie case of discrimination. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020-21 (6th Cir. 2000). If a plaintiff establishes a prima facie case, a presumption of discrimination arises, which can then be rebutted by the defendant through the articulation of a legitimate, nondiscriminatory reason for its employment decision. *Id.* at 1021. Once the defendant has articulated such a reason, the burden then shifts back to the plaintiff to show that the defendant's proffered reason is pretextual. *Id.* Throughout the operation of this burden-shifting framework, "'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Upshaw*, 576 F.3d at 584 (quoting *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004).

1.      **Prima Facie Case**

In order to establish a prima facie case, a plaintiff asserting a discrimination claim based on a failure to promote must show that: "(1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and was denied the promotion;

---

[4] This analytical framework is also applied to the plaintiff's claims brought under 42 U.S.C. § 1981 and the THRA. *See Miller v. City of Canton*, 319 F.'Appx. 411, 419 (6th Cir. 2009); *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 673 (6th Cir. 2008).

and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time [the] plaintiff's request for the promotion was denied." *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 240 (6th Cir. 2005). MedAssets does not dispute that the plaintiff is a member of protected classes (African-American, female) or that Mr. Webb, a white male, possessed similar qualifications to the plaintiff and received the Director of the Nashville Service Center position. Instead, it argues that the plaintiff cannot establish a prima facie case for two reasons. First, MedAssets asserts that the plaintiff did not apply and was not considered for the Director position. (Docket No. 17, at 2.) Second, it contends that, in any event, she was not qualified for the Director position under the company's Transfers and Promotions Policy. (*Id.*)

### a. Failure to Apply and Receive Consideration for the Promotion

Contrary to MedAssets' contention otherwise, the plaintiff asserts that she did apply for the Director of Self-Pay job opening and was considered for the position by corporate decision-makers. (Docket No. 20, at 9.) In support of this assertion, the plaintiff contends that Mr. De La Cruz informed her after Mr. Webb was hired that the decision-makers in MedAssets' corporate office believed that she was not ready to hold the Director of Self-Pay position. (Docket No. 20, at 9; *See also* Docket No. 17, Ex. 1, at 27-28.) She argues that the fact that such a belief was held by the corporate decision-makers demonstrates that she did, in fact, apply for the position. (*Id.*) She adds that it is undisputed that she had made it known to Mr. De La Cruz that she sought advancement to a director-level position. (*Id.*)

While it is undisputed that the plaintiff had communicated her desire to advance to a director-level position, her deposition testimony makes it clear that she never applied for the

actual job that was posted, that is, the Director of Self-Pay position. The plaintiff specifically testified that, after she saw a posting for the Director of Self-Pay opening on an external career website, she discussed her interest in the position with Mr. De La Cruz. (Docket No. 17, Ex. 1, at 18.) According to the plaintiff, Mr. De La Cruz informed her that he did not know why this specific position was posted, as he was unaware of any opening for a Director position. (*Id.*) The plaintiff then testified that, after having this conversation with Mr. De La Cruz, she did not pursue her interest in that specific opportunity any further. (*Id.*) Thus, her deposition testimony plainly establishes that she never actually applied for the Director of Self-Pay position. Moreover, while the plaintiff testified that she would have applied for the position, had she not engaged in the above-referenced conversation with Mr. De La Cruz, the plaintiff has not alleged that Mr. De La Cruz, or any one else at MedAssets, prevented her from applying for the posted Director of Self-Pay position. (Docket No. 17, Ex. 1, at 18.)

However, leaving this argument aside, the court notes that the plaintiff appears to be primarily contending that she lacked the opportunity to apply for the Director position that was actually filled by Mr. Webb when he was hired because that specific position was never posted. She specifically testified that, while MedAssets posted a job opening for a Director of Self-Pay, in actuality, it hired someone (Mr. Webb) to serve as the Director of Accounts Receivable Services in the Nashville office. (Docket No. 17, Ex. 1, at 15, 17.) Because this more expansive position was not actually posted, the plaintiff contends that she lacked any knowledge that such an opening existed and was thus unable to apply. (*Id.* at 19; Docket No. 20, Ex. 1 ¶ 7.)

The Sixth Circuit has previously held that a plaintiff does not have to establish that she applied for and was considered for a promotion "when the employer does not notify its employee

of the available promotion or does not provide a formal mechanism for expressing interest in the promotion." *Dews*, 231 F.3d at 1022. The court finds that the situation presented in this case falls within the exception articulated in *Dews*, because MedAssets never notified the plaintiff of an available promotion to serve as a Director of Accounts Receivable Services in the Nashville office.[5] Instead, the plaintiff was only aware of the promotion opportunity that MedAssets had actually posted, that is, the Director of Self-Pay position, a job the plaintiff chose not to pursue after speaking with Mr. De La Cruz.

### b. Lack of Qualifications for the Promotion

In order to demonstrate that she is qualified for a promotion, the plaintiff must establish that she met an employer's objective qualifications. *Upshaw*, 576 F.3d at 585. MedAssets contends that the plaintiff was not qualified to apply to be the Director of Self-Pay or the Director of Accounts Receivable Services (the position that was actually filled) because she had not been in her present Manager position for at least one year, as was required under the company's Transfers and Promotions Policy. (Docket No. 19, at 11.) However, MedAssets also contends that the plaintiff's failure to satisfy the one-year-in-job requirement constitutes its legitimate, nondiscriminatory reason for not promoting the plaintiff. (Docket No. 19, at 12.) In *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (2011), the Sixth Circuit instructed that an evaluation of whether a plaintiff is qualified at the prima facie stage of a failure to promote case "must be conducted independently of [an employer's] proffered nondiscriminatory reason and must not conflate the prima facie and pretext stages of the *McDonnell Douglas* test."

---

[5] The plaintiff testified that she learned that MedAssets was looking for a Director of Accounts Receivable Services only after Mr. Webb was interviewed by Mr. De La Cruz at the Nashville office. (Docket No. 17, Ex. 1, at 15.)

Accordingly, the court will reserve its review of the plaintiff's failure to comply with the one-year-in-job requirement for the pretext stage of the burden-shifting framework. Apart from the plaintiff's failure to comply with this requirement, MedAssets does not otherwise contend that the plaintiff was unqualified to serve as a Director in the Nashville office. Indeed, the plaintiff's supervisor at the time, Mr. De La Cruz, testified that the only reason the plaintiff was not considered for the Director position was her failure to comply with the aforementioned requirement.

### 2) Legitimate, Nondiscriminatory Reason for Adverse Action

Because the plaintiff has adduced sufficient evidence to establish a prima facie case of discrimination on the basis of race and sex, MedAssets must articulate a legitimate, nondiscriminatory reason for its decision to promote Mr. Webb to the position of Director of Accounts Receivable Services at the Nashville office. *See Dews*, 231 F.3d at 1021. The defendant's burden here is merely one of production, not persuasion, and the court does not make a credibility assessment. *Upshaw*, 576 F.3d at 585-86. As mentioned previously, MedAssets cites the plaintiff's failure to comply with the one-year-in-job requirement contained in its Transfers and Promotions Policy as its legitimate nondiscriminatory reason for its promotion decision. (Docket No. 19, at 12.) This explanation constitutes a facially legitimate reason for not promoting the plaintiff to be the Director of Accounts Receivable Services in Nashville. *See, e.g.*, *Chattman v. Toho Tenax Am., Inc.*, __ F.3d __, No. 10-5306, 2012 WL 2866296, at *6 (6th Cir. July 13, 2012) (noting that violation of safety rules contained in a company's policy manual constituted a legitimate, nondiscriminatory reason for an employer's disciplining of an African-American employee who brought suit for racial discrimination).

### 3)    Pretext

A plaintiff can establish pretext by demonstrating that "(1) the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate [the challenged conduct], or (3) that they were *insufficient* to [explain the challenged conduct]." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994); *See also Upshaw*, 576 F.3d at 587. At issue here is the third category of pretext, under which the plaintiff offers evidence showing that other employees, particularly those outside the protected class, were promoted, even though they too had failed to satisfy a requirement contained in the employer's policy that the employer contends motivated its decision not to promote the plaintiff. *See Chattman*, 2012 WL 2866296, at *6 ("The third category of pretext consists of evidence that other employees, particularly employees outside the protected class, were not disciplined even though they engaged in substantially identical conduct to that which the employer contends motivated its discipline of the plaintiff"). To demonstrate pretext, the plaintiff must adduce "sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that [the defendant] intentionally discriminated against him." *Upshaw*, 576 F.3d at 586 (internal quotation marks and citations omitted).

The plaintiff argues that MedAssets' reliance on the one-year-in-job requirement contained in its Transfers and Promotions Policy is nothing but a pretext for unlawful discrimination. (Docket No. 20, at 10.) Citing the example of Anna Fuller, an African-American female employee who was promoted to a Supervisor-level position despite having been at her current position for less than one year, the plaintiff asserts that she has raised a genuine dispute of material fact as to pretext, because MedAssets failed to uniformly apply its

one-year-in-job eligibility requirement.  (*Id.*)  However, even if a jury could reasonably conclude from this evidence that MedAssets' proffered explanation for not promoting the plaintiff should be rejected, the evidence adduced by the plaintiff "does not establish that *discrimination* was the real reason for [MedAssets'] action."  *Upshaw*, 576 F.3d at 587.  Indeed, to establish pretext under the third category, the plaintiff was required to offer evidence showing that particular employees *outside* of her protected class were promoted by MedAssets, notwithstanding the fact that they, like the plaintiff, had been at their current positions for less than one year.  *See Chattman*, 2012 WL 2866296, at *6.  In contrast, the plaintiff here has only offered evidence showing that Ms. Fuller, an individual belonging to the *same* protected classes as the plaintiff, was the beneficiary of MedAssets' inconsistent application of its Transfers and Promotions Policy.  The plaintiff has otherwise failed to offer any other evidence in support of her assertion that racial and sexual discrimination constituted the real reason behind MedAssets' decision not to promote her.

Based on this record, the court finds that the plaintiff has failed to raise a genuine dispute of material fact as to whether MedAssets' reliance on its Transfers and Promotions Policy was a pretext for race and sex discrimination.  Accordingly, summary judgment will be granted to MedAssets as to the failure to promote claim.

### B.    Disparate Treatment

The plaintiff claims that MedAssets improperly denied her benefits on account of her race.  Specifically at issue is the requirement contained in the November 10, 2010 offer letter that the plaintiff repay her relocation bonus if she decides to voluntarily depart her employment from the company within one year of her start date.  The plaintiff contends that MedAssets

required her to repay the relocation bonus she previously received because it deemed her termination to be voluntary, whereas it did not similarly require a white employee, Greta Clere, to repay her relocation bonus despite her own voluntary departure from the company. (Docket No. 20, at 4-5.)

Again, because the plaintiff has not adduced any evidence of direct discrimination on the basis of race, the court will employ the *McDonnell Douglas/Burdine* burden-shifting framework in analyzing her disparate treatment claim.[6] *See McDonnell Douglas Corp*, 411 U.S. at 802; *Burdine*, 450 U.S. at 252-53; *Upshaw*, 576 F.3d at 584. To establish a prima facie claim for disparate treatment discrimination, a plaintiff must prove the following elements: "(1) membership in the protected class; (2) that he or she suffered from an adverse action; (3) that he or she was qualified for the position; and (4) that he or she was treated differently from similarly situated members of the unprotected class." *Chattman*, 2012 WL 2866296, at *5. MedAssets contends that the plaintiff's disparate treatment claim must fail because she has failed to adduce any evidence demonstrating that she was similarly situated to Ms. Clere. (Docket No. 19, at 13-14.)

To satisfy the similarly situated prong of the prima facie case, the plaintiff must show that she "is similarly situated to the non-protected employee in all *relevant* respects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998). The plaintiff contends that she has made this showing. Specifically, she points out that both she and Ms. Clere were Managers at the Nashville office working under the same supervisor, Mr. De La

_____

[6] Again, this analytical framework is also applied to the plaintiff's claims brought under 42 U.S.C. § 1981 and the THRA. *See Miller v. City of Canton*, 319 F.'Appx. 411, 419 (6th Cir. 2009); *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 673 (6th Cir. 2008).

Cruz.  (Docket No. 20, at 11.)  The plaintiff adds that both she and Ms. Clere were similarly subject to the same company policies, rules, and requirements.  (*Id.*)

However, in the process of raising these similarities, the plaintiff has omitted one key distinction between herself and Ms. Clere that is highly relevant to the resolution of the similarly situated inquiry.  As MedAssets notes, Ms. Clere offered to resign if the company would waive its requirement that she repay the relocation bonus she previously received.  (Docket No. 19, at 13.)  MedAssets accepted this offer.  However, unlike Ms. Clere, the plaintiff maintains that she did not voluntarily leave her employment, but was rather terminated by MedAssets on account of her failure to sign a revised non-compete agreement.  Again, the repayment requirement at issue here is only applicable to those employees who *voluntarily* left the company within one year of their start date.  Because the plaintiff maintains that she did not voluntarily depart her position at MedAssets, the court finds that she cannot be similarly situated to Ms. Clere.  As the plaintiff has failed to establish a prima facie case, the plaintiff's disparate treatment claim will be dismissed.

### C.      Punitive Damages

MedAssets also moves for summary judgment as to the plaintiff's demand for punitive damages.  However, because the court has already dismissed the plaintiff's discrimination claims, there is no longer any need to address the plaintiff's entitlement to punitive damages.  Accordingly, the court will deny MedAssets' motion concerning punitive damages as moot.

### D.      MedAssets' Breach of Contract Claim

Next, MedAssets seeks summary judgment as to its counterclaim for breach of contract.  It is well-settled that, in Tennessee, a viable claim for breach of contract has three essential elements: (1) the existence of an enforceable contract; (2) nonperformance amounting to a

breach of that contract; and (3) damages caused by the breach of contract. *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006).

In its brief supporting the summary judgment motion, MedAssets contends that the plaintiff voluntarily terminated her employment with the company prior to completing one year on the job and was thus obligated, under the terms of the November 10, 2010 offer letter, to repay the $10,000 relocation bonus she received. (Docket No. 19, at 3, 16.) It adds that it has been damaged by the plaintiff's continued failure to repay the $10,000 bonus. (*Id.* at 16.) The plaintiff does not appear to dispute MedAssets' assertion that the signed November 10, 2010 offer letter constitutes an enforceable contract. (*See* Docket No. 20, at 7-9, 12-13.) Rather, she maintains that she did not voluntarily terminate her employment. (*Id.*)

In *Teter v. Republic Parking Sys., Inc.*, 181 S.W.3d 330, 337-38 (Tenn. 2005), the Tennessee Supreme Court analyzed whether an employee's termination from employment was voluntary under circumstances that were analogous to those presented in the instant case. There, the employee signed an employment contract with his employer for an indefinite duration. *Teter*, 181 S.W.3d at 337. Due to a desire to restructure the division in which the employee worked, his employer later presented him with a new proposed employment contract. *Id.* While the parties attempted to renegotiate the employee's contract, his initial employment contract remained in effect. *Id.* According to his employer, if the employee did not sign the new contract, he would be terminated. *Id.* at 338. Nevertheless, the employee did not agree to the new contract. *Id.*

Based on these undisputed facts, the Tennessee Supreme Court concluded that the employer terminated the employee. In reaching this conclusion, it cited the following principles concerning the modification of contracts:

> Modification of an existing contract cannot be accomplished by the unilateral action of one of the parties. There must be the same mutuality of assent and meeting of minds as required to make a contract. New negotiations cannot affect a completed contract unless they result in a new agreement.

*Teter*, 181 S.W.3d at 338. The court therefore concluded that, because the employee did not agree to modify his preexisting employment contract and his employer would not continue to employ him under that contract, the employee did not voluntarily resign his position, but was rather terminated by his employer. *Id.*

The undisputed facts here compel a similar conclusion. The plaintiff signed a non-compete agreement with MedAssets that was effective on June 29, 2009 and was of an indefinite duration. Later, in an effort to standardize its employees to a single consistent non-compete agreement, MedAssets presented a new proposed non-compete agreement to the plaintiff. During this time period, the June 29, 2009 non-compete agreement continued to remain in effect. Like the employer in *Teter*, MedAssets took the position that it would terminate the plaintiff's employment if she refused to sign the new, modified non-compete agreement.[7] The plaintiff, however, refused to sign that agreement and was thus terminated from her employment. Therefore, because the plaintiff did not agree to modify the June 29, 2009 non-compete agreement and MedAssets would not continue to employ her under that contract, the court finds

---

[7] Notably, the June 29, 2009 non-compete agreement provided that it could be amended "with (and only with) the written consent of each of the parties hereto."

that the plaintiff did not voluntarily resign her position, but was rather terminated by MedAssets.[8]

Therefore, the plaintiff did not breach the terms of the November 10, 2010 offer letter and MedAssets' motion for summary judgment as to this claim will be denied. Since the material facts are not in dispute and the defendant has had the opportunity to fully brief this issue, the court will grant summary judgment to the plaintiff and dismiss this claim. *See In re Century Offshore Mgmt. Corp.*, 119 F.3d 409, 412 (6th Cir. 1997) (affirming district court's *sua sponte* grant of summary judgment to nonmoving party where the determinative issue had been fully briefed and the material facts were not in dispute).

### E. MedAssets' Unjust Enrichment Claim

Finally, MedAssets seeks summary judgment on its counterclaim for unjust enrichment. In Tennessee, the elements of an unjust enrichment claim are: (1) "[a] benefit conferred upon the defendant by the plaintiff; 2) appreciation by the defendant of such benefit; and 3) acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (internal quotation marks and citation omitted). "The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust." *Id.*

---

[8] In its brief supporting the summary judgment motion, MedAssets relies on two Tennessee cases, *TGJ & Co. v. Magill*, No. E2003-00298-COA-R3-CV, 2003 WL 22046155 (Tenn. Ct. App. Aug. 28, 2003) and *McPherson v. Stokes*, 954 S.W.2d 749 (Tenn. Ct. App. 1997), to support its argument that the plaintiff's termination was voluntary. However, both of these cases are factually distinguishable from the case at bar and involve an employee's entitlement to unemployment compensation under Tennessee's employment statutes. In any event, the court must follow *Teter*, as it is binding authority from this state's highest court in a case involving circumstances that are factually analogous to those presented here.

MedAssets contends that it is entitled to summary judgment on its unjust enrichment counterclaim because the plaintiff has admitted that she received a reimbursement for charges made to her corporate credit card, but nonetheless failed to pay the corresponding balance that was outstanding.  (Docket No. 19, at 18.)  The plaintiff does not substantively address the issue of unjust enrichment in her opposition brief other than to assert that the claim is not the proper subject for summary judgment.  (Docket No. 20, at 12-13.)

The undisputed record evidence shows that, during the course of her employment, the plaintiff (counterclaim defendant) possessed a corporate credit card that she used for business expenses.  The plaintiff would receive expense reimbursements from MedAssets (counterclaim plaintiff) for charges incurred on the card while she maintained responsibility for paying any outstanding card balances.  On or shortly after the date of her termination, the plaintiff similarly received an expense reimbursement from MedAssets for charges made on the corporate credit card.  However, in this final instance, the plaintiff failed to pay the outstanding card balance.  Indeed, the plaintiff has conceded that she owes an outstanding balance of approximately $2,500 to $2,800.

Based on these undisputed facts, the court finds that MedAssets has established all three elements of an unjust enrichment claim.  First, it conferred a benefit upon the plaintiff, namely, the reimbursement of expenses incurred by the plaintiff on the corporate credit card on or shortly after the date the plaintiff was terminated.  The plaintiff appreciated this benefit, as she has already conceded that she accepted this reimbursement without paying the corresponding balance on the credit card.  She has specifically admitted that she owes approximately $2,500 to $2,800 in unpaid credit card charges.  Under these circumstances, it would be inequitable for the plaintiff to retain the reimbursement made by MedAssets without paying the corresponding balance due on

the corporate credit card. Accordingly, summary judgment will be granted to MedAssets on its unjust enrichment counterclaim.

## CONCLUSION

Based on the foregoing, the Defendant/Counter-Plaintiff's Motion for Summary Judgment (Docket No. 17) will be **GRANTED** in part and **DENIED** in part.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge